**CAPITAL VENTURES INTERNATIONAL, Plaintiff–Appellant,**

v.

**REPUBLIC OF ARGENTINA, Defendant–Appellee.**

No. 05–2591–CV.

United States Court of Appeals, Second Circuit.

Argued: Dec. 23, 2005.

Decided: March 23, 2006.

Kenneth G. Roberts, Wolf, Block, Schorr and Solis–Cohen LLP, New York, N.Y. (Jennifer F. Beltrami and Jill L. Mandell on brief), for Plaintiff–Appellant.

Jonathan I. Blackman, Cleary Gottlieb Steen & Hamilton LLP, New York, N.Y. (Carmine D. Boccuzzi on brief), for Defendant–Appellee.

* Honorable Lewis A. Kaplan, United States District Judge for the Southern District of New York, sitting by designation.

Before: MESKILL and SOTOMAYOR, Circuit Judges, and KAPLAN, District Judge.*

KAPLAN, District Judge.

Plaintiff Capital Ventures International ("CVI") appeals from denial of its motions for an order of attachment and for reconsideration of that ruling.

### Background

#### A. The Brady Plan

In the late 1980s, after a number of Latin–American nations defaulted on their external debt, then United States Treasury Secretary Nicholas F. Brady developed a debt relief program known as the Brady Plan. Under its auspices, the Republic of Argentina ("Argentina") negotiated the restructuring of much of its medium and long-term commercial debt in April of 1992, exchanging an estimated $28.5 billion in unsecured commercial bonds for a series of collateralized bonds due in 2023 (the "Brady Bonds"). The Brady Bonds were secured, pursuant to a 1992 Collateral Pledge Agreement, by United States Treasury and German government bonds (the "Brady Collateral") owned by Argentina and held by the Federal Reserve Bank of New York ("FRBNY"). The Brady Collateral was divided between two separate accounts, one securing Argentina's payment upon maturity of the principal of the Brady Bonds (the "Principal Collateral") and the other securing interest payments to Brady Bond holders prior to maturity (the "Interest Collateral").

#### B. The 1994 Bonds

In 1994, Argentina issued another series of bonds pursuant to various prospectuses

and a Fiscal Agency Agreement. CVI, a Cayman Islands company, acquired a beneficial interest in approximately $111 million worth of these bonds.[1]

In the late 1990s, a decade after the debt crisis that spurred the Brady Plan, Argentina sank into recession. In December 2001, it suspended payments of interest and principal on much of its foreign debt, including the Brady Bonds and the bonds issued in 1994. This constituted an Event of Default under the Fiscal Agency Agreement, permitting holders of the 1994 bonds to declare the principal amount due and payable upon delivery of written notice of acceleration to Argentina.

## C. The 2005 Exchange Offer

In January 2005, following improvement in its economy, Argentina contemplated restructuring at least some of its non-performing debt through an exchange offer (the "Exchange Offer") pursuant to which holders of certain of its Brady and other bonds would be afforded an opportunity to exchange non-performing bonds for cash and additional consideration. It intended to obtain at least part of the necessary cash by liquidating so much of the collateral as secured payment of tendered Brady Bonds, which would become available upon their tender. This, however, created a risk—in the brief interval between the release of the collateral upon the tender of Brady Bonds and the payment of the proceeds of its liquidation to tendering bondholders, a creditor might attach either the collateral or its proceeds. No doubt

for this reason, Argentina, prior to the Exchange Offer, entered into a so-called Continuation of Collateral Agreement pursuant to which the tendering bondholders were granted a security interest in the Principal Collateral and its proceeds until the proceeds were paid to them.

With the Continuation of Collateral Agreement in place, Argentina proceeded with the Exchange Offer. Brady Bond holders were offered cash proceeds of the liquidation of Principal Collateral attributable to any bonds they tendered plus a newly issued bond valued at approximately one-third of the principal amount of any Brady Bonds tendered.

The Principal Collateral attributable to Brady Bonds owned by non-tendering holders could not be sold and, in the ordinary course, will not become available to those holders until the 2023 maturity of the bonds.

## D. Proceedings Below

CVI did not accept the Exchange Offer. In April 2005, it gave written notice of acceleration under the Fiscal Agency Agreement and then sued Argentina for breach of contract based on its default on the 1994 bonds. It sought damages of approximately $111 million plus costs and attorneys fees, and applied for an order attaching the Brady Collateral.[2]

CVI argued principally that it was entitled to attach the portion of the Principal Collateral that would be liquidated to pay tendering Brady Bond holders, thus vali-

---

1. The record does not disclose precisely when CVI acquired the 1994 bonds or, for that matter, whether it did so by subscription or in the secondary market.

2. The motion itself is not in the record, perhaps because CVI presented the court below with an order to show cause, which the court declined to consider *ex parte* and ultimately did not sign after denying the order of attachment. In any case, it is not clear whether CVI sought an order of attachment specifically with reference to the Brady Collateral or instead sought attachment of any property of Argentina with the expectation of levying on the Brady Collateral. Nothing turns on this however.

dating the concern that must have been responsible for the Continuation of Collateral Agreement. It acknowledged that the Brady Bond holders' lien on the Principal Collateral would be superior to any right.it might obtain through attachment prior to the tendering of any bonds. It contended, however, that the portion of the Principal Collateral attributable to tendered Brady Bonds would revert to Argentina, free and clear of the tendering bondholders' security interest, upon the tender, thus giving CVI the senior lien.

The district court concluded that CVI was certain to prevail on its breach of contract claim against Argentina, but it nevertheless denied the order of attachment from the bench for at least one and possibly two reasons.

First, it concluded that the Continuation of Collateral Agreement extended the lien of the tendering bond holders on the Principal Collateral to its proceeds and continued it to the point at which the proceeds were paid over to them. At one point it concluded from this fact that it would not be "proper to allow an attachment ... to simply have [plaintiff] become a junior lien holder, when the instruments that are operative would mean that the junior lien holder would get nothing." Moments later it observed in the same connection that "there is no property interest that is attachable in respect to these bonds."

Second, the court at another point expressed concern that the issuance of an order of attachment "could create a lot of confusion." This appears to have been a reference to possible disruption of the marketplace during the pendency of the Exchange Offer. It is not clear, however, whether the court relied on this concern in denying relief.

Following the bench decision, CVI moved for reconsideration. That application likewise was denied.

The Exchange Offer closed in due course. Argentina liquidated the portion of the Principal Collateral attributable to the tendered bonds and paid the proceeds to the tendering bondholders. Principal Collateral attributable to the untendered Brady Bonds remains in the hands of the FRBNY.

This appeal followed.

## Discussion

CVI concedes that its appeal is moot as to the tendering bondholders' portion of the Principal Collateral, which Argentina already has sold, and its proceeds. It argues, however, that it is entitled to attach certain portions of the Interest Collateral and the Principal Collateral attributable to the non-tendering bondholders, which was not released pursuant to the Exchange Offer.

### A. The Interest Collateral

 CVI did not argue below that it was entitled to attach the Interest Collateral. We generally do not consider a claim raised for the first time on appeal, *Sniado v. Bank Austria AG*, 378 F.3d 210, 213 (2d Cir.2004) (per curiam), and see no reason to do so here.[3] Accordingly, we must determine only whether plaintiff was entitled to attach Argentina's interest in the reversion of the Principal Collateral securing the non-tendered bonds.

### B. The Principal Collateral

#### 1. Attachment Under New York Law

 Attachment is available in a federal court, subject to qualifications not applica-

---

**3.** This conclusion, however, does not foreclose arguments relating to the Interest Collateral in the event of a new application to the district court.

ble here, "under the circumstances and in the manner provided by the law of the state in which the district court is held." FED.R.CIV.P. 64; *accord Cargill, Inc. v. Sabine Trading & Shipping Co., Inc.,* 756 F.2d 224, 227 (2d Cir.1985). The grounds for attachment in New York are set out in Section 6201 of the New York Civil Practice Law and Rules:

"[a]n order of attachment may be granted in any action, except a matrimonial action, where the plaintiff has demanded and would be entitled … to a money judgment against one or more defendants, when:

"(1) the defendant is a nondomiciliary residing without the state, or is a foreign corporation not qualified to do business in the state; or

"(2) the defendant resides or is domiciled in the state and cannot be personally served despite diligent efforts to do so; or

"(3) the defendant, with intent to defraud his creditors or frustrate the enforcement of a judgment that might be rendered in plaintiff's favor, has assigned, disposed of, encumbered or secreted property, or removed it from the state or is about to do any of these acts; or

"(4) the action is brought by the victim or the representative of the victim of a crime, as defined in subdivision six of section six hundred twenty-one of the executive law, against the person or the legal representative or assignee of the person convicted of committing such crime and seeks to recover damages sustained as a result of such crime pursuant to section six hundred thirty-two-a of the executive law; or

"(5) the cause of action is based on a judgment, decree or order of a court of the United States or of any other court which is entitled to full faith and credit in this state, or on a judgment which qualifies for recognition under the provisions of article 53." N.Y. CPLR § 6201 (McKinney 1980 & Supp.2005).

More, however, is required than the existence of a statutory ground for attachment. A plaintiff seeking an order of attachment must show "that there is a cause of action, that it is probable that the plaintiff will succeed on the merits, that one or more grounds for attachment provided in Section 6201 exist, and that the amount demanded from the defendant exceeds all counterclaims known to the plaintiff." N.Y. CPLR § 6212(a) (McKinney 1980). Where a plaintiff obtains an order of attachment, the defendant can move to vacate or modify the order, and its motion will be granted unless the plaintiff can establish also "the need for continuing the levy." N.Y. CPLR § 6223 (McKinney 1980). Moreover, the defendant may challenge the existence of a statutory ground for attachment and the plaintiff's likelihood of success in moving to vacate or modify.

### 2. Discretion in the Attachment Context

 In this case, Argentina concededly is not a domiciliary of the State of New York, and CVI has a cause of action against Argentina for breach of contract. There was no evidence of any counterclaims against CVI, much less any that would exceed the $111 million demanded from Argentina. Nor is there any question that CVI has need for the attachment. Further, the district court found that CVI is likely to succeed on the merits, noting that a "judgment of about $111 million [would] surely be granted in favor of the plaintiff." Accordingly, CVI satisfies all of the statutory requirements for obtaining an order of attachment and sustaining it

against a motion to vacate.[4]

The question, then, is whether the district court erred in denying CVI's application—despite the fact that all statutory requirements were satisfied—based on its view that CVI was unlikely to realize any money from attachment and, perhaps, that granting the order could have generated confusion surrounding the Exchange Offer.

As an initial matter, we note that Argentina does not argue that the district court has unlimited discretion in deciding whether to grant an application for an attachment, nor could it. Affording completely unfettered discretion to trial courts over orders of attachments would not make sense and we find no authority for such a position. To be sure, cases have said that the issuance of an order of attachment is discretionary. *See, e.g., JSC Foreign Econ. Ass'n Technostroyexport v. Int'l Dev. & Trade Serv., Inc.*, 306 F.Supp.2d 482, 485 (S.D.N.Y.2004); *Gen. Textile Printing & Processing Corp. v. Expromtorg Int'l Corp.*, 862 F.Supp. 1070, 1073 (S.D.N.Y.1994). But such general observations are not instructive as to the nature and extent of that discretion or the factors that properly inform its exercise.[5]

■ To determine the scope of a district court's discretion, we start, as always, with the statutory text. Section 6201 states that "[a]n order of attachment *may* be granted in any action, except a matrimonial action," where the plaintiff seeks a money judgment and at least one of the

4. The district court, as noted, stated at one point that "there is no property interest that is attachable in respect to these bonds." But we construe the district court's statement to have been a shorthand reference to its previously expressed view that an order of attachment would leave CVI as a lien holder junior to the tendering bond holders and thus unable to enforce its lien, rather than a holding that there was no attachable interest. If the statement was meant literally, however, it was erroneous.

The lack of any attachable property interest in the Principal Collateral would have been a valid objection to an order of attachment addressed to that property. An order of attachment may be enforced only as against a "debt or property against which a money judgment may be enforced as provided in section 5201." N.Y. CPLR § 6202. But Section 5201 permits enforcement of a money judgment, with exceptions not relevant here, against "any property which could be assigned or transferred, whether it consists of a present or future right or interest and whether or not it is vested." *Id.* § 5201(b). Although the likelihood that the Principal Collateral attributable to the tendered bonds would revert to Argentina was exceedingly small in light of the Continuation of Collateral Agreement, that reversionary interest existed, was assignable and transferable, and therefore was subject to attachment.

5. The characterization of the availability of orders of attachment as discretionary appears to have originated, at least in part, in a number of late nineteenth- and early twentieth-century cases in which the New York Court of Appeals held that it had no power to review decisions denying or vacating orders of attachment because such decisions were discretionary. *See, e.g., Zenith Bathing Pavilion, Inc. v. Fair Oaks S.S. Corp.*, 240 N.Y. 307, 312–14, 148 N.E. 532 (1925) (Cardozo, J.); *Bate v. McDowell*, 97 N.Y. 646 (1884); *Allen v. Meyer*, 73 N.Y. 1 (1878); *Wallace & Sons v. Castle*, 68 N.Y. 370 (1877). The characterization, however, was a product of the limits of the jurisdiction of the New York Court of Appeals, which, with certain exceptions not relevant here, can only consider pure questions of law. Thus, New York Court of Appeals references to discretion with respect to orders of attachment generally rested on the proposition that the Court of Appeals lacked jurisdiction to review decisions regarding orders of attachment that were based upon the weighing of conflicting evidence, which it referred to as the exercise of discretion, rather than the application of law to undisputed facts. *See, e.g., Zenith Bathing Pavilion*, 240 N.Y. at 312, 148 N.E. 532 ("[O]ur own jurisdiction ... limits us to the inquiry whether evidence sufficient to call for the exercise of discretionary judgment is lacking altogether...").

five statutory grounds exists. (emphasis added). But this sheds little light on the question, as the use of the permissive "may" rather than the mandatory "shall" means only that the existence of a statutory ground is a necessary but not a sufficient basis for an order of attachment. Its import, however, becomes clear within the context of the statute as a whole. Sections 6212 and 6223 require, in addition to one of Sections 6201 grounds, probability of success on the merits on a claim in excess of all known counterclaims as well as need for an order of attachment. Thus, the existence of a statutory ground under Section 6201 is not sufficient absent satisfaction of the other requirements.

In reviewing appeals from the denial or grant of an attachment, the Appellate Division has considered both the existence of the statutory requirement and its justification in light of the statutory purposes of the attachment remedy, *viz.*, to obtain *quasi in rem* jurisdiction over the property of non-resident defendants and provide security for potential judgments. *See Maitrejean v. Levon Props. Corp.*, 45 A.D.2d 1020, 1020–21, 358 N.Y.S.2d 203, 205 (2d Dep't 1974); *Dean v. James McHugh Contr. Co.*, 43 A.D.2d 1009, 1009–10, 352 N.Y.S.2d 310, 311–12 (4th Dep't 1974). That is, its review of a motion court's discretion has focused on whether the plaintiff has any need for the attachment. In *Maitrejean*, for example, the court vacated the attachment, finding that it was unwarranted because it was unnecessary for obtaining jurisdiction over the out-of-state defendant corporation or to secure a potential judgment. 45 A.D.2d at 1020, 358 N.Y.S.2d at 205. As the court explained,

"[defendant] Curtiss–Wright . . . is a nationally prominent firm, listed on the New York Stock Exchange, with assets exceeding $200,000,000. It has been authorized to do business in New York since 1936, operates a facility in Buffalo which does business in excess of $8,000,000 per year, owns 1,600 acres of land in the State and has substantial sums in New York banks." *Id.* at 1020–21; 358 N.Y.S.2d at 205.

The court held that, on these facts, the trial court had exercised its discretion improvidently. Thus, although the Appellate Division denied an attachment even though the plaintiff had established its statutory right as against defendant Curtiss–Wright, that discretion was limited to whether the attachment would serve a purpose under the statute.

The legislative history further supports the view that a motion court's "discretion" to grant an application depends on its determination that a plaintiff both satisfies the statutory requirements and establishes the need for an attachment. *See* 3 N.Y. Adv. Comm. Prelim. Rep. 144 (1959) ("Granting an order of attachment is discretionary and the court should consider whether it is actually needed in the case of a foreign corporation."). Similarly, although treatises on New York practice describe attachment as a "discretionary" remedy to which a party has no statutory right, they appear to mean that motion courts may deny attachment for lack of need even though the plaintiff has established a ground under Section 6201 and satisfied the requirements of Section 6212. *See* David D. Siegel, New York Practice § 317 (4th ed. 2005) ("Even if the plaintiff makes out a case for attachment under CPLR 6201, its granting is still discretionary with the court. . . and if the judge should perceive from the papers that the plaintiff does not need an attachment either for jurisdiction or security, discretion is appropriately exercised against it even though a CPLR 6201 showing has been made."); 12 Jack B. Weinstein, et al., New York Civil Practice CPLR § 6201.3 (2d ed. 2005) ("Even if the plaintiff's cause of

action clearly falls within one of the classes of actions in which attachment is available, ... the court must exercise its discretion in terms of whether the order furthers either of the functions that an attachment is designed to serve. Thus, if jurisdiction over the defendant can be secured without attaching property and there is no reason to believe that the defendant will not satisfy any judgment entered against the defendant, an order of attachment should be withheld.").

In sum, then, a motion court presented with an application for an order of attachment must determine whether a statutory ground for attachment exists, whether the applicant has established a likelihood of success on the merits, and whether the remedy is needed to secure payment or obtain jurisdiction. It has discretion to the extent that these determinations require weighing of evidence and also in balancing competing considerations. It will be held to have abused that discretion only if it "applies legal standards incorrectly or relies upon clearly erroneous findings of fact, or proceed[s] on the basis of an erroneous view of the applicable law." *Register.Com, Inc. v. Verio, Inc.*, 356 F.3d 393, 398 (2d Cir.2004) (internal citation and quotation marks omitted). Where, however, a statutory ground for attachment exists and both need and likelihood of success are established, its discretion does not permit denial of the remedy for some other reason, at least absent extraordinary circumstances and perhaps even then. As one court explained,

> "though an attachment is an extraordinary remedy, which may be greatly abused by designing men—a remedy not known to the common law, and one, therefore, which courts should watch with scrupulous jealousy, inasmuch as its effects are so destructive to individual credit, and being one which clothes the creditor with such extraordinary

power over his debtor's estate, that it should only be granted upon full and satisfactory evidence that the application is well founded—*still, when a creditor fairly brings himself, by his application, within the spirit and intent of the statute authorizing this remedial and provisional remedy, he is to be protected in the enjoyment of its advantages."* *Rowles v. Hoare*, 61 Barb. 266 (1870) (emphasis added).

This conclusion is supported by the Appellate Division's approach to appeals from attachment-related decisions where the court determines that the motion court has erred in concluding that the statutory requirements were not satisfied. In many such cases, once it had determined that the statutory requirements in fact were satisfied, the Appellate Division has remanded to the trial court with instructions to grant the order of attachment, or has granted the order of attachment itself, rather than itself exercising discretion or remanding to allow the motion court to do so.

This point is illustrated by *Olbi USA, Inc. v. Agapov*, 283 A.D.2d 227, 724 N.Y.S.2d 839 (1st Dept.2001), an appeal from a Supreme Court decision denying plaintiff's motion for an order of attachment on the ground that plaintiff had not established the statutory requirements. After determining that plaintiff had "sufficiently set forth and substantiated each element necessary to establish plaintiff's entitlement to the order ([under] CPLR §§ 6212 and 6201), including plaintiff's likelihood of success on the merits, [defendant's] non-domiciliary status, and that the amount demanded by plaintiff exceeded all counterclaims against it," the First Department reversed and granted the order of attachment on the law without either exercising discretion itself or remanding to allow the motion court to do so. *See also, e.g., Societe Generale Alsacienne De Banque, Zurich v. Flemingdon Dev. Corp.*, 118

A.D.2d 769, 500 N.Y.S.2d 278 (2d Dept. 1986) (granting an order of attachment without remanding for an exercise of discretion after concluding that the Supreme Court erroneously concluded that plaintiffs had not met the statutory requirements).[6]

 In this case, CVI satisfied each of the requirements of Sections 6201 and 6212 and demonstrated a need for attachment as required by Section 6223. That being so, the district court erred to the extent it denied relief because it considered CVI's chances of realizing on the Principal Collateral to be remote.

 Whether the district court erred also in denying the attachment because such an order might have confused those to whom the Exchange Offer was addressed is a question we need not reach. We can conceive, perhaps, of a situation in which an order of attachment might be against the public interest for some reason not addressed in the CPLR.[7] But the Exchange Offer is now over, so no threat of confusion remains.[8] Given that CVI met all the statutory requirements and that there now is no threat of confusion, we conclude that CVI is entitled to attach Argentina's reversionary interest in the remaining Principal Collateral.[9]

## Conclusion

For the foregoing reasons, the order of the district court is vacated and the case is remanded with instructions to grant CVI's application for an order of attachment with respect to the remaining Principal Collateral. Appellant's motion to issue the mandate forthwith and to continue the temporary restraining order previously entered is granted to the extent that the Clerk is directed to issue the mandate forthwith and to cause it to be delivered to the Clerk of the District Court for docketing immediately upon the filing of this opinion and otherwise denied.

**6.** The Appellate Division's treatment of appeals from Supreme Court decisions vacating orders of attachment also is instructive, although the statutory standard for vacating an order of attachment varies slightly from the standard for granting the order in the first instance. N.Y. CPLR § 6223 (McKinney 1980). The Appellate Division repeatedly has reversed such decisions after finding that the statutory requirements were satisfied and then reinstated the attachment orders as a matter of law without itself exercising discretion or remanding to allow the motion court to do so. *E.g., Elton Leather Corp. v. First Gen. Res. Co.,* 138 A.D.2d 132, 137, 529 N.Y.S.2d 769, 772 (1st Dept.1988); *Intermar Overseas, Inc. v. Argocean S.A.,* 117 A.D.2d 492, 497–98, 503 N.Y.S.2d 736, 739–40 (1st Dept.1986); *Unitech USA, Inc. v. Ponsoldt,* 91 A.D.2d 903, 903–04, 457 N.Y.S.2d 526, 528–29 (1st Dept.1983).

**7.** District courts may consider potential effects on the public interest in determining whether to grant another provisional remedy, the preliminary injunction. *Register.Com,* 356 F.3d at 424 (quoting *Brody v. Vill. of Port Chester,* 261 F.3d 288, 290 (2d Cir.2001) (F.I. Parker, *J.,* draft opinion)).

**8.** Where, as here, circumstances have changed between a ruling below and a decision on appeal, and there is no conceivable dispute as to the change itself or its effect on the case, we may consider the change even though it was not considered by the district court. *See New England Merchs. Nat'l Bank v. Iran Power Generation & Transmission Co.,* 646 F.2d 779, 783–84 (2d Cir.1981); *Korn v. Franchard Corp.,* 456 F.2d 1206, 1208 (2d Cir.1971).

**9.** CVI's lien, should it levy on the Principal Collateral, presumably would be subordinate to the lien of the remaining Brady Bond holders, so its ability to realize anything by the levy may be remote. The question whether the prospective benefit is worth the cost of the litigation, however, is uniquely for the litigant, not the Court.