Judge LEVAL concurs in a separate opinion.
GERARD E. LYNCH, Circuit Judge:
In this case we again address the continuing dispute between Argentina and its various private creditors. In a previous case involving the same parties, we decided that plaintiff-appellant Capital Ventures International (“CVI”) may attach Argentina’s reversionary interest in the collateral securing certain bonds issued by Argentina. See Capital Ventures Int’l v. Republic of Argentina, 443 F.3d 214, 216 (2d Cir.2006) {“CVI I ”). We now hold that CVI is entitled to maintain its attachments even though a quirk of the bonds’ Collateral Pledge Agreement means that the attachments will effectively block a proposed exchange between Argentina and the holders of the bonds. We therefore reverse the *268 district court’s orders that modified the attachments to permit the exchange.
BACKGROUND
This case represents one line in one chapter in the long history of Argentina’s struggle with foreign creditors' — a struggle that dates back to 1827. See EM Ltd. v. Republic of Argentina, 473 F.3d 463, 466 n. 2 (2d Cir.2007). The prior chapter began in the mid-1980s, when Argentina ran into financial trouble and defaulted on its foreign debts. In 1992, seeking to recover from this default, Argentina replaced tens of billions of dollars’ worth of its old bonds with new bonds — called “Brady bonds”— issued under a program of Latin-Ameriean debt relief overseen by U.S. Treasury Secretary Nicholas Brady. See CVI I, 443 F.3d at 216. The Brady bonds at issue in this case will come due in 2023.
As part of the Brady program, Argentina obtained U.S.- and German-government securities as collateral to secure payments on the Brady bonds. See id. (Because our case involves only the collateral securing principal payments, not interest, see id. at 218, all future mentions of “collateral” will refer only to that.) Under the Collateral Pledge Agreement that governs the Brady bonds, the Federal Reserve Bank of New York, as Collateral Agent for the Brady bondholders, holds a first-priority security interest in the collateral. See Collateral Pledge Agreement §§ 2.01, 9.05. On the maturity date in 2023, the Agreement provides that either (a) Argentina will repay the holders of the Brady bonds, or (b) the Collateral Agent will give the collateral to the bondholders through their ■ agent. See id. §§ 3.03, 3.04.
As a general matter, the Agreement prohibits any transfer of the collateral pri- or to the maturity date, even in the case of default. Id. § 2.01(c). It does allow, however, for early redemption or exchange and provides that in such a case the lien would terminate and the collateral revert to Argentina. Id. § 6.01.
The next and current chapter of this history began in 2001, when Argentina stopped paying interest on its debt again, in “the largest default of a foreign state in history,” EM Ltd., 473 F.3d at 466 n. 2, involving “roughly $80 to $100 billion of sovereign debt,” Seijas v. Republic of Argentina, 606 F.3d 53, 55 (2d Cir.2010). This default set off a contest among Argentina’s creditors to collect on their claims, with much of the contest taking place in the United States federal courts— including at least nineteen cases in this Court so far.
In 2005, as Argentina’s financial condition improved, it offered to exchange its defaulted Brady bonds (as well as other defaulted bonds) for the proceeds of the collateral securing them plus new debt that Argentina would issue. CVI I, 443 F.3d at 217. This deal offered potential benefits to each side, as the Brady bondholders would receive some cash immediately (as well as a new, less valuable but nonetheless performing security) instead of having to wait until 2023 to receive their collateral, and Argentina would be able to clear its books of much of its nonperforming debt.
A quirk in the original Collateral Pledge Agreement, however, created a risk for the exchanging parties. That Agreement allowed early release of the collateral only to Argentina, free and clear of the Brady bondholders’ lien — and thus open to attack by other creditors in the time it would take Argentina to receive the collateral, liquidate it, and pay its proceeds to the Brady bondholders. See Collateral Pledge Agreement § 6.01; CVI I, 443 F.3d at 217. Aware of this risk, Argentina and the parties tendering their Brady bonds for exchange entered into a Continuation of Collateral Pledge Agreement that extended *269 the security interest in the tendered bonds’ collateral during its transfer and liquidation. CVI I, 443 F.3d at 217.
At this point, CVI enters the story, setting in motion the events leading up to CVI I. CVI held certain non-Brady bonds on which Argentina had also defaulted. Id. Rather than participate in the exchange, CVI chose to sue Argentina to collect on the defaulted bonds it held and, as the parties to the exchange had feared, sought to attach Argentina’s reversionary interest in the Brady collateral. The district court denied the attachment. Id. at 218. CVI appealed, but during the pendency of CVI’s appeal the 2005 exchange went forward, with bondholders tendering and exchanging Brady bonds with a face value of approximately $2.8 billion as part of an overall exchange (Brady and non-Brady) of $62.3 billion.
The completion of the 2005 exchange mooted the case with respect to the bonds tendered in that exchange. Id. CVI nevertheless maintained its appeal in an attempt to ensure that, if Argentina offered “another exchange someday” for the remaining Brady bonds, CVI would receive the collateral upon its release. The attachment requested by CVI would have the practical effect, as then-Judge Sotomayor noted at oral argument, of “forcing Argentina.... to stay in default [on the Brady bonds] and wait until 20[2]3” to give up the collateral to the Brady bondholders, rather than entering into another exchange like the one just completed.
This Court ruled in CVI’s favor, holding that CVI could attach Argentina’s reversionary interest in the remaining collateral (that is, the collateral not involved in the 2005 exchange). CVI I, 443 F.3d at 223. CVI had undoubtedly met the requirements for attachment under New York law, which applies to this case under Federal Rule of Civil Procedure 64. Id. at 218-19. Where these requirements are met, we held, a district court has little if any discretion to deny the attachment, and so “the district court erred to the extent it denied relief because it considered CVI’s chances of realizing on the Principal Collateral to be remote.” Id. at 223.
The day after this Court’s decision, CVI returned to the district court and was granted attachments on Argentina’s reversionary interest in the remaining Brady collateral. These attachments, as amended and extended, remained in full force from 2006 until October 2010.
This past year, however, Argentina proposed another exchange for Brady bondholders, albeit one much smaller than the 2005 exchange. (This time, the Brady bonds likely to be tendered constituted roughly one hundred million dollars in face value, in comparison with the billions at stake in the first exchange.) CVI’s attachments posed a potential obstacle to the transfer and liquidation of that collateral, however, and Argentina sought to modify the attachments to facilitate the deal. Specifically, counsel for Argentina asked the court to permit “the Federal Reserve ... to liquidate the pro rata share of the Brady principal collateral attributed to the tendered Brady bonds and transfer those proceeds directly to any tendering Brady holder [or] a custodian designated to receive those proceeds in trust for them.”[1]
At a hearing on October 27, 2010, Judge Griesa allowed the modification. He emphasized that “the collateral was pledged for the benefit of the Brady bondholders, and if the Brady bondholders, through proper channels, desire to realize upon that collateral in an exchange offer, and if *270 they go through proper channels and procedures, they are exercising their proper rights to that collateral.” He ultimately viewed the issue as one between Argentina and the Brady bondholders: “for this court to try to tell the Brady bondholders and the Republic what they should or should not do between themselves for the benefit of the Brady bondholders is something I don’t think this court has any business doing.” He acknowledged CVI’s right to Argentina’s reversionary interest, but noted that that interest “exists subject to various conditions, including the overall terms of the pledge agreement ... [which] includes a provision allowing it to be amended.” He therefore granted the motion “so that in the event that there’s a proper exercise of the right to amend the pledge agreement under its terms, I will permit that to be done in order to allow the collateral to be used” for the exchange. He nevertheless stayed his order pending CVI’s expedited appeal. Several other parties with similar attachments against Argentina’s interest in the Brady collateral have joined CVI’s appeal; for simplicity we will refer to all of them collectively as “CVI.”
DISCUSSION
CVI’s appeal presents two issues: (1) whether the attachments block the proposed exchange, and, (2) if so, whether the district court properly modified the attachments to allow the exchange. We address them in turn.
I. The Effect of CVI’s Attachments on the Proposed Exchange
The parties dispute whether the attachments we ordered block the exchange in the first place. Under New York law, an attachment bars “any sale, assignment or transfer of, or any interference with” the property attached. N.Y. C.P.L.R. 6214(b); see Fitchburg Yarn Co. v. Wall & Co., 46 A.D.2d 763, 361 N.Y.S.2d 170, 172 (1st Dep’t 1974). If the proposed exchange does none of these things, then the district court’s order modifying the attachments was just a formality that did not affect CVI’s rights. If it does, however, then we must ask whether the circumstances justify lifting the attachments so far as necessary to allow the exchange.
In CVI I, we concluded that “CVI is entitled to attach Argentina’s reversionary interest in the remaining Principal Collateral.” 443 F.3d at 223. The Collateral Pledge Agreement gives Argentina at least two such reversionary interests. First, Argentina will receive the collateral in 2023 if it pays the Brady bondholders in full. See Collateral Pledge Agreement § 3.03(a)(ii). That much is uncontroversial.
Argentina also has a second reversionary interest: even before 2023, Section 6.01 gives it the collateral if it “redeems ... or exchanges or causes to be purchased or exchanged” any of the bonds, at which time “the Lien of this Agreement in favor of the Holders in respect of such Released Securities [the collateral] shall terminate, such Released Securities shall be free of the Lien of this Agreement and all rights with respect to such Released Securities shall revert to Argentina.” Id. § 6.01. In laymen’s terms, a pre-2023 exchange lifts the lien in favor of the Brady bondholders and returns the collateral to Argentina.
The modification to the attachments that Argentina requested and received would destroy this second reversionary interest with respect to the exchanged bonds. Under the district court’s order, the collateral would not revert to Argentina in an exchange as under Section 6.01 but would rather go to the benefit of the Brady bondholders. Specifically, the order permitted the Federal Reserve to liquidate the collateral attributable to the tendered Brady *271 bonds and transfer the collateral directly to the tendering bondholders or their representatives, and to “amend the Collateral Pledge Agreements” in order to accommodate this transaction. The amendment, by effectively writing Section 6.01 out of the Agreement, would eliminate the reversionary interest that that section currently gives Argentina, and thereby “interfere[] with” the attached property. N.Y. C.P.L.R. 6214(b).
Argentina presents several arguments that the exchange would not infringe on CVFs attachments, none prevailing. It primarily relies on the senior security interest in the collateral held by the Federal Reserve on behalf of the Brady bondholders. See Collateral Pledge Agreement §§ 2.01, 9.05. CVI does not dispute the seniority of that security interest, which both makes it impossible (or at least pointless) for CVI to foreclose on the collateral and means that CVI cannot stop the collateral from going to the Brady bondholders if Argentina does not pay up in 2023, as Section 3.04 provides. But this security interest only goes so far.
The Uniform Commercial Code provides that “a security interest ... continues in collateral ... unless the secured party authorized the disposition free of the security interest.” N.Y. U.C.C. § 9-315(a)(l) (emphasis added). Here, the Collateral Pledge Agreement specifically authorizes the disposition of the collateral free of the security interest in the event that any exchange or redemption occurs before 2023. As noted above, Section 6.01 states that in such a situation “the Lien of this Agreement in favor of the Holders in respect of such Released Securities [the collateral] shall terminate, such Released Securities shall be free of the Lien of this Agreement and all rights with respect to such Released Securities shall revert to Argentina.”
Argentina ignores Section 6.01 and argues instead that Section 9.05 of the Collateral Pledge Agreement extends the security interest in favor of the Brady bondholders beyond the time of the exchange. Section 9.05, titled “Continuing Security Interest,” provides that the security interest shall “remain in full force and effect ... until the Principal Bonds ... are no longer outstanding and all interest ... has been paid in full, whereupon the Lien of this Agreement ... shall terminate, all Collateral ... of Principal Bonds shall become free of the Lien of this Agreement, and all rights with respect to the Collateral ... shall revert to Argentina.” § 9.05(a).
Although Section 9.05 speaks of the general existence and endurance of the lien in favor of the Brady bondholders, it does not address what happens in the event of an exchange. Section 6.01 governs that eventuality and explicitly states that the lien lifts upon exchange or redemption. New York, whose law the Agreement adopts, follows the common (and commonsensical) rule that a specific provision like Section 6.01 governs the circumstance to which it is directed, even in the face of a more general provision like Section 9.05. See Muzak Corp. v. Hotel Taft Corp., 1 N.Y.2d 42, 46, 150 N.Y.S.2d 171, 133 N.E.2d 688 (1956); Aramony v. United Way of Am., 254 F.3d 403, 413-14 (2d Cir.2001).
Next, Argentina notes that the Collateral Pledge Agreement explicitly provides for its own amendment, see § 9.01, and argues that it and the Brady bondholders may exercise that right even in the face of CVTs attachments. The district court similarly reasoned that Argentina may amend the Agreement to go forward with the exchange because the attached reversionary interest “exists subject to various conditions, including the overall terms of the pledge agreement ... [which] includes a provision allowing it to be amended.”
*272 But the Brady bondholders have no right to amend the Agreement unilaterally; the amendment proposed here requires Argentina’s approval. And Argentina would violate the attachments if it gave its approval to an amendment that destroyed its reversionary interest under Section 6.01. Put another way, the right to approve or disapprove a proposed modification of the Agreement to give up Argentina’s reversionary interest is itself an attribute of that interest and thus an inextricable part of what CVI has attached.
The contrary logic of Argentina and the district court would allow Argentina and the Brady bondholders to amend the Agreement to eliminate not only the reversion in case of an exchange but also the reversion in case Argentina repays the bondholders in 2023, leaving CVI with nothing. That logic is therefore inconsistent with our conclusion in CVI I that Argentina’s reversionary rights are attachable property. 443 F.3d at 220 n. 4. We do not mean to imply that attachment of an interest in any executory contract thereby prohibits any amendment to that contract. We merely hold that allowing this amendment would effectively destroy CVI’s attached reversionary interest under § 6.01 and thereby violate the attachment. The amendment provision therefore does not help Argentina, and the exchange may not go forward against the original attachments.[2]
II. The Ongoing Validity of CVI’s Attachments
The next question is whether the district court properly modified the attachments to allow the exchange. New York law allows a court to modify or vacate an attachment only on certain specified grounds. See N.Y. C.P.L.R. 6223. In our earlier decision, we concluded that “CVI satisfies all of the statutory requirements for obtaining an order of attachment and sustaining it against a motion to vacate.” 443 F.3d at 219-20 (emphasis added). Specifically, we found that:
(a) CVI showed a statutory ground for attachment under N.Y. C.P.L.R. 6201(1) because “Argentina eoncededly is not a domiciliary of the State of New York, and CVI has a cause of action against Argentina for breach of contract.”
(b) CVI met the further requirements of N.Y. C.P.L.R. 6212(a) because “[tjhere was no evidence of any counterclaim against CVI,” and “the district court found that CVI is likely to succeed on the merits.”
(c) CVI sought to attach an attachable property interest under N.Y. C.P.L.R. 6202 and 5201(b) because, “[although the likelihood that the Principal Collateral attributable to the tendered bonds would revert to Argentina was exceedingly small in light of the Continuation of Collateral Agreement, that reversionary interest existed, was assignable and transferable, and therefore was subject to attachment.”
CVI I, 443 F.3d at 219-20 & n. 4.
We also addressed CVI’s ability to sustain its attachments against a motion to vacate them. Under N.Y. C.P.L.R. 6223(b), a plaintiff faced with a motion to *273 vacate or modify an attachment must show that it still meets the above requirements and must also show “the need for continuing the levy.” We found it beyond question that “CVI has need for the attachment.” CVI I, 443 F.3d at 219.[3]
The situation before us, five years later, presents no relevant change. If anything, CVI’s position is stronger because no continuation of collateral agreement protects these tendering Brady bondholders. CVI therefore meets the statutory standards at least as well as it did in 2006.
When a plaintiff meets these standards, we held in CVI I, the district court’s “discretion does not permit denial of the remedy for some other reason, at least absent extraordinary circumstances and perhaps even then.” Id. at 222. Because we saw no extraordinary circumstances present in 2006, we did not reach whether New York law allows discretionary denial (or modification or vacation) of an otherwise appropriate attachment based on public policy. Id. at 222-23. That question will remain open because we again find no circumstances to warrant such a discretionary modification even assuming its possibility.
Argentina points to two aspects that might make this case “extraordinary.” First, it emphasizes the plight of the holders of the Brady bonds, who are the beneficiaries of the collateral yet who will not be able to access it until 2023 thanks to CVI’s attachments. But it is inevitable that attachments will have consequences for third parties, and sometimes even third parties who themselves share an interest in the relevant assets. See, e.g., In re Amaranth Nat. Gas Commodities Litig., 711 F.Supp.2d 301, 313 (S.D.N.Y.2010) (allowing attachment on assets of hedge fund even with effect of harming innocent investors in the fund). Here, the consequences are not dire. The bondholders will get no less than they originally bargained for; they lose only their flexibility to arrange a different deal. It is unfortunate, from their perspective, that CVI gets to play the role of the spoiler and to try to extract concessions from Argentina at their expense. But that is just a consequence of CVT’s exercising the rights to which it is entitled under New York law, as recognized in our prior opinion. If the bondholders have liquidity needs that will not permit them to wait until 2023 for their collateral, they may sell their bonds in the secondary market for distressed debt (a market with which many players here are, no doubt, already familiar). And, of course, to the extent Argentina really wants to help its bondholders, it is free to pay them some or all of the money it owes them.
Argentina’s other argument for a discretionary modification focuses on its own interests as a sovereign country trying to clean up its balance sheet in the wake of an economic crisis. But the projected exchange is relatively small by the standards of international finance, and especially compared to Argentina’s 2005 exchange, with the potentially tendered bonds here only amounting to roughly one hundred million dollars in face value. Argentina provides no evidence that failure to do this deal will have a substantial effect on its finances or its ability to access the capital markets. We therefore find no circumstance extraordinary enough to justify a discretionary modification of the at *274 tachments, even assuming the possibility of such a modification.
CONCLUSION
For the reasons stated, we REVERSE the orders of the district court.

. The parties have filed the proposal for the 2010 exchange under seal. To preserve confidentiality, we refer to it in the general terms available in the public record, to the extent necessary to make our opinion intelligible.

. As noted above, Argentina has not advanced any interpretation of § 6.01 or otherwise contended that, under the terms of that section considered in isolation, the collateral would not revert to Argentina free and clear of the lien in the performance of the exchange. Instead, Argentina relies on its reading of § 9.01 and § 9.05 of the Collateral Pledge Agreement, which we have rejected for the reasons discussed above. We therefore have no occasion to discuss the issues raised in Judge Leval’s concurring opinion.

. Although the district court’s orders purported only to ”modif[y]” the attachments, they effectively vacated them in part, eliminating CVI's attachment of Argentina’s reversionary interest in a pre-2023 exchange. We therefore do not consider whether a different standard might apply to more technical modifications of an attachment, such as to conform the attachment to cover only property that is properly attachable.