10-4520-cv (L)
Capital Ventures International v. Republic of Argentina

UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

August Term, 2010

(Heard: December 16, 2010    Decided: July 20, 2011)

Docket Nos. 10-4520-cv(Lead), 10-4523-cv(Con), 10-4511-cv(Con), 10-4834-cv(Con)

CAPITAL VENTURES INTERNATIONAL,

*Plaintiff-Appellant*,

— v.—

REPUBLIC OF ARGENTINA,

*Defendant-Appellee.*

B e f o r e:

LEVAL, CALABRESI and LYNCH, *Circuit Judges*.

Appeals from orders of the United States District Court for the Southern District of New York (Thomas P. Griesa, *Judge*) modifying attachments imposed following remand in Capital Ventures International v. Republic of Argentina, 443 F.3d 214 (2d Cir. 2006). We conclude that appellant Capital Ventures International is entitled to maintain its attachments as originally ordered.

REVERSED.

———————————

M. NORMAN GOLDBERGER, Ballard Spahr LLP, Philadelphia, PA (Jennifer F. Beltrami, Cozen O'Connor, New York, NY, *on the brief*), *for Plaintiff-Appellant Capital Ventures International*.

CARMINE D. BOCCUZZI (Jonathan I. Blackman, Christopher P. Moore, *on the brief*), Cleary Gottlieb Steen & Hamilton LLP, New York, NY, *for Defendant-Appellee the Republic of Argentina*.

Michael C. Spencer, Gary S. Snitow, Milberg LLP, New York, NY, *for Plaintiffs-Appellants Abel Amoroso et al*.

Anthony J. Costantini, Duane Morris LLP, New York, NY, *for Plaintiff-Appellant Allen Applestein*.

Daniel J. Popeo, Richard A. Samp, Washington Legal Foundation, Washington, D.C., *for* Amicus Curiae *Washington Legal Foundation in Support of Plaintiffs-Appellants*.

———————————

GERARD E. LYNCH, *Circuit Judge*:

In this case we again address the continuing dispute between Argentina and its various private creditors. In a previous case involving the same parties, we decided that plaintiff-appellant Capital Ventures International ("CVI") may attach Argentina's reversionary interest in the collateral securing certain bonds issued by Argentina. See Capital Ventures Int'l v. Republic of Argentina, 443 F.3d 214, 216 (2d Cir. 2006) ("CVI I"). We now hold that CVI is entitled to maintain its attachments even though a quirk of the bonds' Collateral Pledge Agreement means that the attachments will effectively block a proposed exchange between Argentina and the holders of the bonds. We therefore reverse the district court's orders that modified the attachments to permit the exchange.

# BACKGROUND

This case represents one line in one chapter in the long history of Argentina's struggle with foreign creditors – a struggle that dates back to 1827. See EM Ltd. v. Republic of Argentina, 473 F.3d 463, 466 n.2 (2d Cir. 2007). The prior chapter began in the mid-1980s, when Argentina ran into financial trouble and defaulted on its foreign debts. In 1992, seeking to recover from this default, Argentina replaced tens of billions of dollars' worth of its old bonds with new bonds – called "Brady bonds" – issued under a program of Latin-American debt relief overseen by U.S. Treasury Secretary Nicholas Brady. See CVI I, 443 F.3d at 216. The Brady bonds at issue in this case will come due in 2023.

As part of the Brady program, Argentina obtained U.S.- and German-government securities as collateral to secure payments on the Brady bonds. See id. (Because our case involves only the collateral securing principal payments, not interest, see id. at 218, all future mentions of "collateral" will refer only to that.) Under the Collateral Pledge Agreement that governs the Brady bonds, the Federal Reserve Bank of New York, as Collateral Agent for the Brady bondholders, holds a first-priority security interest in the collateral. See Collateral Pledge Agreement §§ 2.01, 9.05. On the maturity date in 2023, the Agreement provides that either (a) Argentina will repay the holders of the Brady bonds, or (b) the Collateral Agent will give the collateral to the bondholders through their agent. See id. §§ 3.03, 3.04.

As a general matter, the Agreement prohibits any transfer of the collateral prior to the maturity date, even in the case of default. Id. § 2.01(c). It does allow, however, for early redemption or exchange and provides that in such a case the lien would terminate and the collateral revert to Argentina. Id. § 6.01.

The next and current chapter of this history began in 2001, when Argentina stopped paying interest on its debt again, in "the largest default of a foreign state in history," EM Ltd., 473 F.3d at 466 n.2, involving "roughly $80 to $100 billion of sovereign debt," Seijas v. Republic of Argentina, 606 F.3d 53, 55 (2d Cir. 2010). This default set off a contest among Argentina's creditors to collect on their claims, with much of the contest taking place in the United States federal courts – including at least nineteen cases in this Court so far.

In 2005, as Argentina's financial condition improved, it offered to exchange its defaulted Brady bonds (as well as other defaulted bonds) for the proceeds of the collateral securing them plus new debt that Argentina would issue. CVI I, 443 F.3d at 217. This deal offered potential benefits to each side, as the Brady bondholders would receive some cash immediately (as well as a new, less valuable but nonetheless performing security) instead of having to wait until 2023 to receive their collateral, and Argentina would be able to clear its books of much of its nonperforming debt.

A quirk in the original Collateral Pledge Agreement, however, created a risk for the exchanging parties. That Agreement allowed early release of the collateral only to Argentina, free and clear of the Brady bondholders' lien – and thus open to attack by

4

other creditors in the time it would take Argentina to receive the collateral, liquidate it, and pay its proceeds to the Brady bondholders.  See Collateral Pledge Agreement § 6.01; CVI I, 443 F.3d at 217.  Aware of this risk, Argentina and the parties tendering their Brady bonds for exchange entered into a Continuation of Collateral Pledge Agreement that extended the security interest in the tendered bonds' collateral during its transfer and liquidation.  CVI I, 443 F.3d at 217.

At this point, CVI enters the story, setting in motion the events leading up to CVI I.  CVI held certain non-Brady bonds on which Argentina had also defaulted.  Id.  Rather than participate in the exchange, CVI chose to sue Argentina to collect on the defaulted bonds it held and, as the parties to the exchange had feared, sought to attach Argentina's reversionary interest in the Brady collateral.  The district court denied the attachment.  Id. at 218.  CVI appealed, but during the pendency of CVI's appeal the 2005 exchange went forward, with bondholders tendering and exchanging Brady bonds with a face value of approximately $2.8 billion as part of an overall exchange (Brady and non-Brady) of $62.3 billion.

The completion of the 2005 exchange mooted the case with respect to the bonds tendered in that exchange.  Id.  CVI nevertheless maintained its appeal in an attempt to ensure that, if Argentina offered "another exchange someday" for the remaining Brady bonds, CVI would receive the collateral upon its release.  The attachment requested by CVI would have the practical effect, as then-Judge Sotomayor noted at oral argument, of "forcing Argentina . . . . to stay in default [on the Brady bonds] and wait until 20[2]3" to

5

give up the collateral to the Brady bondholders, rather than entering into another exchange like the one just completed.

This Court ruled in CVI's favor, holding that CVI could attach Argentina's reversionary interest in the remaining collateral (that is, the collateral not involved in the 2005 exchange). CVI I, 443 F.3d at 223. CVI had undoubtedly met the requirements for attachment under New York law, which applies to this case under Federal Rule of Civil Procedure 64. Id. 218-19. Where these requirements are met, we held, a district court has little if any discretion to deny the attachment, and so "the district court erred to the extent it denied relief because it considered CVI's chances of realizing on the Principal Collateral to be remote." Id. at 223.

The day after this Court's decision, CVI returned to the district court and was granted attachments on Argentina's reversionary interest in the remaining Brady collateral. These attachments, as amended and extended, remained in full force from 2006 until October 2010.

This past year, however, Argentina proposed another exchange for Brady bondholders, albeit one much smaller than the 2005 exchange. (This time, the Brady bonds likely to be tendered constituted roughly one hundred million dollars in face value, in comparison with the billions at stake in the first exchange.) CVI's attachments posed a potential obstacle to the transfer and liquidation of that collateral, however, and Argentina sought to modify the attachments to facilitate the deal. Specifically, counsel for Argentina asked the court to permit "the Federal Reserve . . . to liquidate the pro rata

6

share of the Brady principal collateral attributed to the tendered Brady bonds and transfer those proceeds directly to any tendering Brady holder [or] a custodian designated to receive those proceeds in trust for them."[1]

At a hearing on October 27, 2010, Judge Griesa allowed the modification. He emphasized that "the collateral was pledged for the benefit of the Brady bondholders, and if the Brady bondholders, through proper channels, desire to realize upon that collateral in an exchange offer, and if they go through proper channels and procedures, they are exercising their proper rights to that collateral." He ultimately viewed the issue as one between Argentina and the Brady bondholders: "for this court to try to tell the Brady bondholders and the Republic what they should or should not do between themselves for the benefit of the Brady bondholders is something I don't think this court has any business doing." He acknowledged CVI's right to Argentina's reversionary interest, but noted that that interest "exists subject to various conditions, including the overall terms of the pledge agreement . . . [which] includes a provision allowing it to be amended." He therefore granted the motion "so that in the event that there's a proper exercise of the right to amend the pledge agreement under its terms, I will permit that to be done in order to allow the collateral to be used" for the exchange. He nevertheless stayed his order pending CVI's expedited appeal. Several other parties with similar attachments against Argentina's interest in the Brady collateral have joined CVI's appeal; for simplicity we will refer to all of them collectively as "CVI."

---

[1] The parties have filed the proposal for the 2010 exchange under seal. To preserve confidentiality, we refer to it in the general terms available in the public record, to the extent necessary to make our opinion intelligible.

7

## DISCUSSION

CVI's appeal presents two issues: (1) whether the attachments block the proposed exchange, and, (2) if so, whether the district court properly modified the attachments to allow the exchange. We address them in turn.

## I.   **The Effect of CVI's Attachments on the Proposed Exchange**

The parties dispute whether the attachments we ordered block the exchange in the first place. Under New York law, an attachment bars "any sale, assignment or transfer of, or any interference with" the property attached. N.Y. C.P.L.R. 6214(b); see Fitchburg Yarn Co. v. Wall & Co., 361 N.Y.S.2d 170, 172 (1st Dep't 1974). If the proposed exchange does none of these things, then the district court's order modifying the attachments was just a formality that did not affect CVI's rights. If it does, however, then we must ask whether the circumstances justify lifting the attachments so far as necessary to allow the exchange.

In CVI I, we concluded that "CVI is entitled to attach Argentina's reversionary interest in the remaining Principal Collateral." 443 F.3d at 223. The Collateral Pledge Agreement gives Argentina at least two such reversionary interests. First, Argentina will receive the collateral in 2023 if it pays the Brady bondholders in full. See Collateral Pledge Agreement § 3.03(a)(ii). That much is uncontroversial.

Argentina also has a second reversionary interest: even before 2023, Section 6.01 gives it the collateral if it "redeems . . . or exchanges or causes to be purchased or exchanged" any of the bonds, at which time "the Lien of this Agreement in favor of the Holders in respect of such Released Securities [the collateral] shall terminate, such

8

Released Securities shall be free of the Lien of this Agreement and all rights with respect to such Released Securities shall revert to Argentina." Id. § 6.01. In laymen's terms, a pre-2023 exchange lifts the lien in favor of the Brady bondholders and returns the collateral to Argentina.

The modification to the attachments that Argentina requested and received would destroy this second reversionary interest with respect to the exchanged bonds. Under the district court's order, the collateral would not revert to Argentina in an exchange as under Section 6.01 but would rather go to the benefit of the Brady bondholders. Specifically, the order permitted the Federal Reserve to liquidate the collateral attributable to the tendered Brady bonds and transfer the collateral directly to the tendering bondholders or their representatives, and to "amend the Collateral Pledge Agreements" in order to accommodate this transaction. The amendment, by effectively writing Section 6.01 out of the Agreement, would eliminate the reversionary interest that that section currently gives Argentina, and thereby "interfere[] with" the attached property. N.Y. C.P.L.R. 6214(b).

Argentina presents several arguments that the exchange would not infringe on CVI's attachments, none prevailing. It primarily relies on the senior security interest in the collateral held by the Federal Reserve on behalf of the Brady bondholders. See Collateral Pledge Agreement §§ 2.01, 9.05. CVI does not dispute the seniority of that security interest, which both makes it impossible (or at least pointless) for CVI to foreclose on the collateral and means that CVI cannot stop the collateral from going to the Brady bondholders if Argentina does not pay up in 2023, as Section 3.04 provides. But this security interest only goes so far.

The Uniform Commercial Code provides that "a security interest . . . continues in collateral . . . *unless the secured party authorized the disposition free of the security interest*." N.Y. U.C.C. § 9-315(a)(1) (emphasis added). Here, the Collateral Pledge Agreement specifically authorizes the disposition of the collateral free of the security interest in the event that any exchange or redemption occurs before 2023. As noted above, Section 6.01 states that in such a situation "the Lien of this Agreement in favor of the Holders in respect of such Released Securities [the collateral] shall terminate, such Released Securities shall be free of the Lien of this Agreement and all rights with respect to such Released Securities shall revert to Argentina."

Argentina ignores Section 6.01 and argues instead that Section 9.05 of the Collateral Pledge Agreement extends the security interest in favor of the Brady bondholders beyond the time of the exchange. Section 9.05, titled "Continuing Security Interest," provides that the security interest shall "remain in full force and effect . . . until the Principal Bonds . . . are no longer outstanding and all interest . . . has been paid in full, whereupon the Lien of this Agreement . . . shall terminate, all Collateral . . . of Principal Bonds shall become free of the Lien of this Agreement, and all rights with respect to the Collateral . . . shall revert to Argentina." § 9.05(a).

Although Section 9.05 speaks of the general existence and endurance of the lien in favor of the Brady bondholders, it does not address what happens in the event of an exchange. Section 6.01 governs that eventuality and explicitly states that the lien lifts upon exchange or redemption. New York, whose law the Agreement adopts, follows the common (and commonsensical) rule that a specific provision like Section 6.01 governs

10

the circumstance to which it is directed, even in the face of a more general provision like Section 9.05. See Muzak Corp. v. Hotel Taft Corp., 1 N.Y.2d 42, 46 (1956); Aramony v. United Way of Am., 254 F.3d 403, 413-14 (2d Cir. 2001).

Next, Argentina notes that the Collateral Pledge Agreement explicitly provides for its own amendment, see § 9.01, and argues that it and the Brady bondholders may exercise that right even in the face of CVI's attachments. The district court similarly reasoned that Argentina may amend the Agreement to go forward with the exchange because the attached reversionary interest "exists subject to various conditions, including the overall terms of the pledge agreement . . . [which] includes a provision allowing it to be amended."

But the Brady bondholders have no right to amend the Agreement unilaterally; the amendment proposed here requires Argentina's approval. And Argentina would violate the attachments if it gave its approval to an amendment that destroyed its reversionary interest under Section 6.01. Put another way, the right to approve or disapprove a proposed modification of the Agreement to give up Argentina's reversionary interest is itself an attribute of that interest and thus an inextricable part of what CVI has attached.

The contrary logic of Argentina and the district court would allow Argentina and the Brady bondholders to amend the Agreement to eliminate not only the reversion in case of an exchange but also the reversion in case Argentina repays the bondholders in 2023, leaving CVI with nothing. That logic is therefore inconsistent with our conclusion in CVI I that Argentina's reversionary rights are attachable property. 443 F.3d at 220 n.4. We do not mean to imply that attachment of an interest in *any* executory contract thereby

11

prohibits *any* amendment to that contract. We merely hold that allowing *this* amendment would effectively destroy CVI's attached reversionary interest under § 6.01 and thereby violate the attachment. The amendment provision therefore does not help Argentina, and the exchange may not go forward against the original attachments.[2]

## II.    **The Ongoing Validity of CVI's Attachments**

The next question is whether the district court properly modified the attachments to allow the exchange. New York law allows a court to modify or vacate an attachment only on certain specified grounds. See N.Y. C.P.L.R. 6223. In our earlier decision, we concluded that "CVI satisfies all of the statutory requirements for obtaining an order of attachment *and* sustaining it against a motion to vacate." 443 F.3d at 219-20 (emphasis added). Specifically, we found that:

(a)    CVI showed a statutory ground for attachment under N.Y.
       C.P.L.R. 6201(1) because "Argentina concededly is not a
       domiciliary of the State of New York, and CVI has a cause of
       action against Argentina for breach of contract."

(b)    CVI met the further requirements of N.Y. C.P.L.R. 6212(a)
       because "[t]here was no evidence of any counterclaim against
       CVI," and "the district court found that CVI is likely to

---

[2] As noted above, Argentina has not advanced *any* interpretation of § 6.01 or otherwise contended that, under the terms of that section considered in isolation, the collateral would not revert to Argentina free and clear of the lien in the performance of the exchange. Instead, Argentina relies on its reading of § 9.01 and § 9.05 of the Collateral Pledge Agreement, which we have rejected for the reasons discussed above. We therefore have no occasion to discuss the issues raised in Judge Leval's concurring opinion.

succeed on the merits."

    (c)    CVI sought to attach an attachable property interest under N.Y. C.P.L.R. 6202 and 5201(b) because, "[a]lthough the likelihood that the Principal Collateral attributable to the tendered bonds would revert to Argentina was exceedingly small in light of the Continuation of Collateral Agreement, that reversionary interest existed, was assignable and transferable, and therefore was subject to attachment."

CVI I, 443 F.3d at 219-20 & n.4.

We also addressed CVI's ability to sustain its attachments against a motion to vacate them. Under N.Y. C.P.L.R. 6223(b), a plaintiff faced with a motion to vacate or modify an attachment must show that it still meets the above requirements and must also show "the need for continuing the levy." We found it beyond question that "CVI has need for the attachment." CVI I, 443 F.3d at 219.[3]

The situation before us, five years later, presents no relevant change. If anything, CVI's position is stronger because no continuation of collateral agreement protects these tendering Brady bondholders. CVI therefore meets the statutory standards at least as well as it did in 2006.

_____

[3] Although the district court's orders purported only to "modif[y]" the attachments, they effectively vacated them in part, eliminating CVI's attachment of Argentina's reversionary interest in a pre-2023 exchange. We therefore do not consider whether a different standard might apply to more technical modifications of an attachment, such as to conform the attachment to cover only property that is properly attachable.

13

When a plaintiff meets these standards, we held in CVI I, the district court's "discretion does not permit denial of the remedy for some other reason, at least absent extraordinary circumstances and perhaps even then." Id. at 222. Because we saw no extraordinary circumstances present in 2006, we did not reach whether New York law allows discretionary denial (or modification or vacation) of an otherwise appropriate attachment based on public policy. Id. at 222-23. That question will remain open because we again find no circumstances to warrant such a discretionary modification even assuming its possibility.

Argentina points to two aspects that might make this case "extraordinary." First, it emphasizes the plight of the holders of the Brady bonds, who are the beneficiaries of the collateral yet who will not be able to access it until 2023 thanks to CVI's attachments. But it is inevitable that attachments will have consequences for third parties, and sometimes even third parties who themselves share an interest in the relevant assets. See, e.g., In re Amaranth Nat. Gas Commodities Litig., 711 F. Supp. 2d 301, 313 (S.D.N.Y. 2010) (allowing attachment on assets of hedge fund even with effect of harming innocent investors in the fund). Here, the consequences are not dire. The bondholders will get no less than they originally bargained for; they lose only their flexibility to arrange a different deal. It is unfortunate, from their perspective, that CVI gets to play the role of the spoiler and to try to extract concessions from Argentina at their expense. But that is just a consequence of CVI's exercising the rights to which it is entitled under New York law, as recognized in our prior opinion. If the bondholders have liquidity needs that will not permit them to wait until 2023 for their collateral, they may sell their bonds in the

14

secondary market for distressed debt (a market with which many players here are, no doubt, already familiar). And, of course, to the extent Argentina really wants to help its bondholders, it is free to pay them some or all of the money it owes them.

Argentina's other argument for a discretionary modification focuses on its own interests as a sovereign country trying to clean up its balance sheet in the wake of an economic crisis. But the projected exchange is relatively small by the standards of international finance, and especially compared to Argentina's 2005 exchange, with the potentially tendered bonds here only amounting to roughly one hundred million dollars in face value. Argentina provides no evidence that failure to do this deal will have a substantial effect on its finances or its ability to access the capital markets. We therefore find no circumstance extraordinary enough to justify a discretionary modification of the attachments, even assuming the possibility of such a modification.

## CONCLUSION

For the reasons stated, we REVERSE the orders of the district court.

Leval, J., concurring.

I join in my colleagues' ruling but somewhat unhappily. As I see it, there are arguments which might conceivably rebut the reasoning of the majority opinion, but those arguments have not been advanced in the litigation. In a matter of this complexity, especially when all sides are represented by excellent counsel, I think it more prudent not to venture beyond the contentions that have been fully argued. Perhaps Argentina did not raise these arguments because it recognizes them to be without merit. Perhaps CVI would have had good answers, had the arguments been advanced. I nonetheless will set forth in brief the concerns that leave me with doubts.

The essential cog of my colleagues' ruling is that, if the contemplated exchange for new bonds were performed, the literal terms of Section 6.01 of the Collateral Pledge Agreement mandate that during the course of the exchange, the collateral securing the original issue of Brady bonds would revert to Argentina, free and clear of any lien in favor of the bondholders, whereupon CVI's attachment would take hold of the collateral, diverting it from its intended role of providing collateral for the new substitute bonds to the satisfaction of Argentina's debt to CVI. Argentina has not disputed this reading of § 6.01. Argentina contends rather that, in this circumstance, § 6.01 is overridden by other provisions of the Agreement.

There are two arguments not made by Argentina which seem to me potentially capable of refuting this essential step in the reasoning of the majority opinion. I set them out briefly.

I. The first argument focuses on the seniority of competing claims. Regardless of

1

the meaning of § 6.01, the collateral does not revert to Argentina free and clear in the performance of the contemplated exchange because the exchange agreement commits it to be used as continuing security for the bondholders—in part for the immediate payment of a part of the obligation it originally secured, and in part to secure payment at a later date of the new bonds issued to cover the remainder of the debt. It is clear beyond question that Argentina would not be free to grab the collateral and run, using it for its own purposes and leaving the Brady bondholders high and dry. If Argentina attempted to do so, claiming authority over the collateral under § 6.01, a court at the insistence of the bondholders would enforce the terms of the exchange agreement, barring Argentina from diverting the collateral from its agreed use as security for the bondholders.

CVI would of course assert that its attachment predates the lien created by the exchange agreement and is therefore senior to it. But it is not clear to me that a court of equity should, or would, deem the lien securing the new substitute bonds as a new lien rather than as a continuation, in slightly altered form, of the bondholders' preexisting lien. The mere fact that Argentina and the bondholders have agreed to alter the schedule under which the collateral is used to pay the debt owed to the bondholders does not alter the fact that the collateral is still reserved for the sole purpose of paying the debt it originally secured. If at any time any part of the collateral in fact becomes available to Argentina for other uses, it will unquestionably be vulnerable to seizure under the attachment, but that does not necessarily mean that a court would deem this to have happened merely because of the substitution of a new agreement for the old.

To illustrate the argument, we might consider hypothetical situations which similarly involve the use of the collateral to secure new substitute bonds issued after a creditor of Argentina obtained an attachment.

a) Suppose as the first example that, after grant of an attachment to a creditor of Argentina, new bonds are to be issued with the agreement of all parties to the Brady bonds to replace the old, with repayment secured by the same collateral. The sole reason for the replacement is the discovery of a potentially confusing typographical error in the original bonds – perhaps the typographer's accidental omission of a "not" in some obscure provision which is immaterial to the attaching creditor's interests. Apart from the correction of the typographical error, the terms of the new substitute bonds are identical to the terms of the old replaced series.

b) Alternatively, after grant of an attachment to a creditor, a change in the tax laws of some country threatens to subject to a new onerous tax bonds which have a feature that is present in the boilerplate of the Brady bonds. Because the presence or absence of that tax-triggering feature is of no meaningful significance either to Argentina or the holders, they enter into an agreement to substitute new bonds for the old, which are identical in all respects except for the elimination of the problem clause.

In each case, the attaching creditor pounces at the moment of the exchange, demanding of the court that the collateral be seized to pay the debt owed to it. The terms of § 6.01 would appear to apply to these hypothetical cases in exactly the

3

same way as they apply to the facts now before us. The attaching party would assert that, because its attachment predates the exchange agreement, its attachment is senior to the pledge under the new amended bonds.

Notwithstanding the chronological sequence and the identical application of § 6.01, I have difficulty imagining that a court of equity would accept so inequitable a resolution. The attaching party's claim of seniority would give it windfall of full recovery while stripping the other bondholders of their collateral. The Brady bonds previously secured one hundred cents on the dollar as to principal by United States Treasury obligations would become unsecured obligations of Argentina. The attaching creditor would succeed by a strategic maneuver in pole vaulting over the other similarly placed creditors, achieving full payment leaving the others with nothing. I think it highly likely that a court of equity would deem the new substitute pledge of the collateral as a continuation of the old pledge, thus retaining its seniority over the prior attachment.

If I am correct in that speculation, the question then arises whether this exchange is meaningfully different because the present alteration of terms regarding the schedule of payment diminishes the likelihood of a reversion of the collateral to Argentina that would bring the attachment to fruition. The immediate use of part of the collateral to pay a part of the principal of the bonds diminishes the opportunities for some turn of events between now and the original maturity date that might result in Argentina's payment of the bonds from some source other than the collateral, which event would cause the reversion of the collateral to Argentina, subject to the attachment. I am not sure, however, that this difference has any pertinence. So long as the collateral is not diverted by Argentina to

4

uses other than the satisfaction of its debt represented by the Brady bonds, it seems to me questionable whether the substitution of a new calendar for use of the collateral to pay the Brady bonds should be deemed to forfeit the seniority of the bondholders' lien. If Argentina were to reach agreement with bondholders to cancel the bonds altogether upon surrender to the bondholders of 100% of the collateral, this would eliminate all possibility of the attachment ever bearing fruit. Does that necessarily represent an unfairness to the attaching creditor given that the entire collateral was expected from the first to be consumed in payment of the bonds? The crucial question as to seniority, it seems to me, would not be whether the new arrangement diminishes the likelihood of the fruition of the attachment, but whether by the new arrangement Argentina succeeds in using the collateral for its own purposes going beyond its original role of securing the debt represented by the Brady bonds. The issue in any event has not been raised in this litigation.

II. A second argument not advanced by Argentina which, I think, might conceivably have rebutted CVI's position is that § 6.01 of the Collateral Pledge Agreement, notwithstanding ambiguity, was never intended by any contracting party to apply to an exchange of this nature. Section 6.01, which contains what my colleagues described as a "quirk" of drafting, was created to govern an entirely different situation. The section provides (omitting distracting inessentials),

> Section 6.01. If . . . Argentina redeems . . . or purchases or exchanges . . . any . . . Principal Bond and surrenders such Principal Bond to the Fiscal Agent for cancellation . . . , *the Fiscal Agent shall, upon the request of Argentina . . . send to the Collateral Agent a Request for the Release of Principal Collateral . . . .* If . . . the Collateral Agent receives such a Request for the Release of Principal Collateral

5

. . . the Collateral Agent shall . . . deliver . . . in accordance with the instructions given by Argentina . . . Pledged Securities [i.e., collateral] [in corresponding amount]. Upon such . . . delivery, the Lien of this Agreement in favor of the Holders . . . shall terminate, such [collateral] shall be free of the Lien of this Agreement and all rights with respect to such [collateral] shall revert to Argentina. (emphasis added).

The provision's intended purpose is clearly apparent. At least in theory the possibility existed that at some point during the long life of the bonds, Argentina might purchase, redeem, or exchange them, employing resources other than the collateral provided by the United States Treasury. For example, Argentina and bondholders might have found it mutually advantageous to cancel the bonds and for Argentina to assign instead to the bondholders an interest in a number of years of Argentina's grain production or in acreage in the Pampas. Alternatively, Argentina might simply buy bonds and submit them for cancellation. In any such event, after the bonds had been purchased or exchanged and cancelled, the collateral would no longer serve its intended purpose of securing the payment of the bond principal. The purpose of § 6.01 was to make clear that when bonds have been so purchased, redeemed, or exchanged, and cancelled, the collateral, being no longer employed in its originally intended use, reverts to Argentina.

While § 6.01 was undoubtedly intended to apply to any such purchase, redemption or exchange achieved by Argentina through use of resources other than the collateral, I think it questionable whether this section providing for free and clear reversion to Argentina was ever intended or understood by any participant in the Brady bond agreements as having application to a circumstance in which a substitute agreement between Argentina and the holders of the original bonds is financed by use of the

6

collateral. Where an exchange agreement is dependent on the continuing use of the collateral to satisfy the debt owed to the bondholders, such new agreement is inconsistent with Argentina's obtaining a free and clear reversion. More importantly, as this case illustrates, deeming the collateral to have reverted free and clear to Argentina in the performance of such an exchange makes it vulnerable to attachment by any creditor of Argentina, thus threatening to leave empty-handed the bondholders who in good faith believed they were exchanging one collateralized security for another.

It appears at least arguable that the present transaction does not necessarily conform either to the intended purposes or to the literal terms of § 6.01. Because § 6.01 was drafted to make clear Argentina's absolute entitlement to the reversion of the collateral when the collateral is no longer employed to secure the Brady debt, the provision of § 6.01 for such reversion requires as a preliminary step that Argentina make, through the Fiscal Agent, a "Request for the Release of Principal Collateral." (The Fiscal Agent then forwards the Request for the Release to the Collateral Agent, which then delivers the collateral pursuant to Argentina's instructions, free and clear of the lien in favor of the bondholders). Under the present exchange agreement, however, (as well as under the hypothetical situations outlined above) Argentina would not demand that the collateral be released. Its instructions would be rather that the Collateral Agent retain the collateral as security for the Brady bondholders, using part for immediate redemption of a part of the Brady debt, and holding the remainder as security for the remainder of the Brady debt under the newly agreed schedule. It is therefore not clear to me that the sequence of events would conform to the sequence described in § 6.01 that results in free

7

and clear reversion of the collateral to Argentina.

Arguably at least, the section is ambiguous as to whether the contractual term "Request for the Release of Principal Collateral" covers not only a demand by Argentina for the delivery of the collateral to it free and clear of the bondholders' lien, but also a demand to continue to employ the collateral to secure the Brady debt.

As these contracts are of enormous complexity and these issues of interpretation have not been debated by the parties for our edification, I take no position on them. Perhaps these questions will be debated in some future litigation involving either Argentina's or another nation's Brady debt. Perhaps they will be seen to have no relevance and be discarded. In any event, for today's case I concur in my colleagues' ruling.